Sandra JONES–REID

v.

**Michael J. ASTRUE, Commissioner, Social Security Administration.**

CIV. No. 3:10–cv–1497 (WWE).

United States District Court, D. Connecticut.

May 14, 2012.

Winona W. Zimberlin, Hartford, CT, for Sandra Jones–Reid.

Ann M. Nevins, U.S. Attorney's Office, Bridgeport, CT, for Michael J. Astrue, Commissioner, Social·Security Administration.

### ORDER

WARREN W. EGINTON, District Judge.

The Decision of the Commissioner is hereby affirmed. The Clerk is instructed to close this case.

### RECOMMENDED RULING ON CROSS MOTIONS

HOLLY B. FITZSIMMONS, United States Magistrate Judge.

Sandra Jones–Reid brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final administrative decision of the Commissioner of Social Security (Commissioner) denying her claim for Disability Insurance Benefits (DIB), and Supplemental Security Income (SSI). (Pl.'s Compl., p. 1). The decision of the Administrative Law Judge (ALJ) was upheld by the Decision Review Board (DRB). The ALJ concluded that (1) as to the application for DIB, the Plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act (Act); and (2) as to the application for SSI, the Plaintiff is not disabled under section 1614(a)(3)(A) of the Act.

For the reasons discussed below, Plaintiff's Motion for Judgment **[Doc. # 15]** is **DENIED,** and Defendant's Motion to Affirm the Decision of the Commissioner **[Doc. # 29]** is **GRANTED.**

### I. *ADMINISTRATIVE PROCEEDINGS.*

Ms. Jones–Reid filed an application for SSI and DIB on June 27, 2008. (Certified Transcript of Record, dated November 18, 2010, hereinafter "Tr." at 10, 230–35). Ms. Jones–Reid's alleged onset of disability was April 1, 2008. (Tr. at 10, 230).

The Social Security Administration notified Ms. Jones–Reid that her initial claim for benefits was denied on August 28, 2008. (Tr. at 101–03). Upon reconsideration, the claim was denied again on February 18, 2009. (Tr. at 108–10).

Following the denial on reconsideration, Ms. Jones–Reid requested a hearing, (Tr. at 104–5, 106–7), which occurred before ALJ Marlene W. Heiser on July 30, 2009. (Tr. at 27–64). The ALJ issued a decision, dated May 21, 2010, finding that Ms. Jones–Reid was not disabled during the relevant period. (Tr. at 7–26). The DRB selected the case for review, and issued a notice of decision on August 24, 2010, affirming the decision of the ALJ, and making the ALJ's decision the final decision of the Commissioner. (Tr. at 1–5).

Plaintiff appeals to this Court, and the case is now ripe for review under 42 U.S.C. §§ 405(g), and 1383(c)(3).

### II. *STANDARD OF REVIEW.*

The Act provides for judicial review of the Commissioner's denial of benefits. 42 U.S.C. §§ 405(g), 1383(c)(3). This is not de novo review—the Court may not decide facts, re-weigh evidence or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala,* 1 F.3d 571, 577 (7th Cir.1993). Primarily, the Court reviews the decision to determine whether the Commissioner applied the correct legal standard. *Tejada v. Apfel,* 167 F.3d 770, 773 (2d Cir.1999); *see also Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir.1987) (holding where ALJ failed ·to apply correct legal principles, his finding cannot be up-

held even if there is substantial evidence for it).

Secondly, the Court reviews whether the Commissioner's determination was supported by substantial evidence. *Tejada*, 167 F.3d at 773. "Substantial evidence" is evidence that a reasonable mind would accept as adequate to support a conclusion; it is "more than a mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), *quoted in Pollard v. Halter*, 377 F.3d 183, 188 (2d Cir.2004). The Court considers the entire administrative record, including new evidence submitted as part of the administrative appeals process, following the ALJ's decision. *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir.1996). To enable a reviewing court to decide whether the determination is supported by substantial evidence, the ALJ must set forth the crucial factors with sufficient specificity. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir.1984). This includes determinations that the testimony of any witness is not credible. *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir.1988).

## III. BACKGROUND.

### A. Age, Education, Work Experience.

Plaintiff was born on June 22, 1957. (Tr. at 31). She completed her eighth grade education and received no further schooling or formal training. (Tr. at 31).

From 1992 to 2007, Plaintiff held jobs in the restaurant industry, manufacturing and assembly industry, and as a life guard. (Tr. at 270). The last job Plaintiff held was as a prep cook in a restaurant. (Tr. at 270).

Plaintiff claims that as of December 1, 2007, she became disabled because of both physical and mental impairments, and has not been employed or held any job since that time. (Tr. at 32, 158).

### B. ALJ Hearing.

#### 1. Plaintiff's Testimony.

On July 30, 2009, the Plaintiff testified at a hearing before ALJ Marlene W. Heiser. (Tr. at 29). In her opening remarks, the Plaintiff's attorney argued that the Plaintiff has mental and physical impairments, including major depression, borderline personality disorder, low back pain, coronary artery disease, seventy (70) percent renal artery stenosis, Hepatitis C, chronic pain left shoulder pain, chronic knee pain, chronic abdominal pain, cirrhosis of the liver, obesity, and sleep apnea. (Tr. at 29)

Plaintiff testified that she has not held any employment since her amended onset date (AOD) of December 1, 2007. (Tr. at 31). Plaintiff testified that, in the fifteen years preceding her AOD, the longest job she held was as a prep cook at Bugaboo Creek, a restaurant. (Tr. at 32). As a prep cook, the Plaintiff's duties included preparing vegetables, making dressings, stocking, and cleaning. (Tr. at 32–3). Those duties required the Plaintiff to lift and carry the dressings in containers that weighed 70–90 pounds. (Tr. at 33). Plaintiff also had to carry various other items weighing anywhere from 20–40 pounds on a daily basis. (Tr. at 33).

According to the Plaintiff, she was disabled and prevented from working due to chronic pain in her knees, back, and left shoulder. (Tr. at 33). Plaintiff testified that her knees especially bothered her when it was rainy or humid, and sometimes swelled. (Tr. at 33–4).

Plaintiff testified that sometimes her back felt great but with one wrong move she would have shooting pain in her back, down her sides, and in her hips. (Tr. at 34). By Plaintiff's testimony, she had

problems with her back "at least three times a week," and the pain lasted for one (1) to two (2) days or longer. (Tr. at 34). To control the pain, Plaintiff normally took Robaxin or ibuprofen in conjunction with Trazodone, which was effective because it put her to sleep. (Tr. at 35). The Plaintiff testified that her back pain began in 2000 following a car accident. (Tr. at 35). Plaintiff indicated that the medication she took for her back pain also worked for her shoulder pain, saying "[t]he same medication works for it all." (Tr. at 36).

As a result of her injuries, the Plaintiff said she could only walk "maybe two blocks," and she could not sit or lie in any place for too long. (Tr. at 36). The Plaintiff came to the hearing with a cane which she said was prescribed following a visit to Hartford Hospital, where she was treated for a swollen knee. (Tr. at 37).

Plaintiff also testified that she got dizzy at times; had sleep apnea, for which she used a machine; and had a blocked heart valve, and a seventy (70) percent blockage in her liver. (Tr. at 42).

By Plaintiff's account she could only sit or stand for twenty (20) minutes before she had a problem with pain. (Tr. at 38). Plaintiff testified the maximum she could lift was about 10 pounds. (Tr. at 38).

Plaintiff said her pain, on a typical day, was an eight out of ten. Plaintiff testified that she had trouble reaching above her head with her left shoulder, and bending at the waist. (Tr. at 46).

Regarding daily activities, Plaintiff testified she lived alone in an apartment where she did all her own cooking. (Tr. at 38). Plaintiff did clean the apartment but had her nieces help with things that were low to the ground. (Tr. at 39). She had no problems taking care of her personal hygiene, doing her laundry, and shopping for food. (Tr. at 39). Plaintiff further testi-fied that she drove about six hours a week to see her mother, but that she preferred to stay home. (Tr. at 39). She liked staying home because she got agitated. (Tr. at 39).

Plaintiff described herself as depressed, and said it caused her to cry a lot, and stay to herself, but that her medication helped. (Tr. at 40).

Plaintiff also testified that she had memory issues, or problems concentrating. (Tr. at 40). She testified she could no longer make good judgments with respect to problems at work; she felt guilty all the time; and she could not complete a full workweek because of her psychiatric problems. (Tr. at 43).

As for leisure activities, Plaintiff testified that reading frustrated her, she did not care for television, had no hobbies. But she did listen to jazz music on the radio. (Tr. 40, 41). Plaintiff said that before she became "ill," she enjoyed swimming, dancing, and walking. As for social life, she said that she had no close friends except her mother, and did talk to her sister and brother occasionally. (Tr. at 41).

### 2. Witness' Testimony.

Ms. Johnny Grice testified that she had known the Plaintiff for over twelve (12) years. According to Ms. Grice, the Plaintiff was more outgoing when they met than she was at the time of the hearing, and that over the last two (2) to three (3) years, the Plaintiff changed. (Tr. at 49).

Ms. Grice also testified that the Plaintiff had memory issues, as well as problems with walking, sitting, and bending at the waist. (Tr. at 50–1). Ms. Grice believed that the Plaintiff had trouble making simple decisions, and that the Plaintiff struggled with lifting heavy objects. (Tr. at 52). Ms. Grice said that the Plaintiff avoided using her left arm to reach, and that the

Plaintiff was irritable when tired. (Tr. at 52).

### 3. Vocational Expert's Testimony.

A vocational expert ("VE"), Renee Jubrey, then testified. (Tr. at 53). The VE identified that the previous work of the Plaintiff as a "cook helper," *Dictionary of Occupational Titles* ("*DOT*") title 317.687–010, medium unskilled work. (Tr. at 53–54).

The VE was familiar with the Commissioner's definitions of sedentary, light, heavy-medium, heavy, and very heavy work. (Tr. at 54). Given a set of hypothetical limitations, which included: an individual with the exertional capacity for light work; who can occasionally bend, climb stairs, balance, stoop, kneel, crouch, and crawl; who cannot climb ropes, ladders, scaffolds, or be exposed to hazards like moving machinery or unprotected heights; who cannot reach above their shoulder with their left arm; who can only receive short simple instructions; who can only work in an environment with few workplace changes and no public contact; the VE opined that the hypothetical limitations would prevent performance of the Plaintiff's past work. (Tr. at 54).

When the ALJ amended the hypothetical to provide that the individual should have no regular contact with the public, instead of no contact whatsoever, the VE opined that there were jobs in the national economy that matched the hypothetical limitations. (Tr. at 54). The first job the VE described was a marker, *DOT* title 209.587–034, unskilled light work. (Tr. at 55). The VE said that there were 370 marker positions in the State of Connecticut and 628,000 positions nationally. (Tr. at 55). A second position identified by the VE was mail clerk, *DOT* title 209.687–026, unskilled light work. (Tr. at 55). The VE opined that there were 500 mail clerk positions within the State of Connecticut and

1,500,000 positions nationally. (Tr. at 55). A third position identified by the VE was routing clerk, *DOT* title 222.687.022, unskilled light work. (Tr. at 55). According to the VE, there were 400 routing clerk positions in the State of Connecticut and 751,000 nationally. (Tr. at 55).

The ALJ then asked the VE to adjust the hypothetical limitations to include a sit/stand option, where the individual has the ability to sit or stand, changing positions at will. (Tr. at 55). The VE said that the identified mail clerk position would still fit, but that there were no other positions to match the added criteria. (Tr. at 55).

The VE then testified that her testimony was based on her personal experience in labor market surveys, and a study on employer validation of jobs performed with a sit/stand option. (Tr. at 56). The Plaintiff's attorney requested that copies of the study and the surveys referenced by the VE be entered as exhibits. (Tr. at 56). The ALJ granted the request as to the study but denied it as to the surveys. (Tr. at 56).

On cross-examination, considering the previous hypothetical with the added criteria that the individual be off task for four-and-a-half hours a week, the VE testified that there were no unskilled jobs where the individual could be off task more than ten (10) percent of the time. (Tr. at 57). The Plaintiff's attorney then requested that documents in front of the VE, used by the VE in forming her opinion be added to the record. (Tr. at 57). The ALJ denied the request. (Tr. at 57).

Plaintiff's attorney asked the VE whether it mattered if a claimant were limited to short simple instructions, and the claimant was over or under 50. (Tr. at 59). The VE testified that it would not matter if age were the only qualifier. (Tr. at 59). The

Plaintiff's attorney then asked the VE about the "grid." (Tr. at 60). The ALJ cut short the questioning, as the VE was not an expert on the "grid." (Tr. at 60). Asked whether she could identify companies in Connecticut that employ mail clerks, the VE said she could, but the ALJ did not allow it. (Tr. at 60).

Plaintiff's attorney then posed a new hypothetical to determine if any jobs existed for an individual with the same age, education, and experience as the Plaintiff who could sit one hour; never stand and walk at work; occasionally lift or carry up to five pounds; never lift or carry six or more pounds; could not use their arms to push or pull arm controls; could not use their hands for find manipulation; could not use their feet for repetitive pushing, or pulling of leg controls; who could never bend, squat, crawl, climb, or reach with the left hand; who could never be around unprotected heights, moving machinery, or marked changes in temperature, humidity, or drive automotive equipment, or be around dust or fumes. (Tr. at 60). The VE opined that no jobs existed for an individual with the posed limitations. (Tr. at 60).

The VE then testified that there were no written guidelines for determining the number of jobs that exist for particular *DOT* titles. (Tr. at 60). The VE also said that there was no data source or methodology for reliably determining the number of jobs by *DOT* codes, but that the Bureau of Labor Statistics provides a starting point for the determination. (Tr. at 61).

The VE said she relied on her personal knowledge for over 60 percent of her determination as to the number of jobs in Connecticut, and for over 30 percent of her determination as to the number of jobs in the nation. (Tr. at 61). Similarly, the VE said she relied on job surveys she personally performed for 60–70 percent of the determination as to the number of jobs in Connecticut, and 30–40 percent for the numbers of jobs in the nation. (Tr. at 61). The VE did not provide a percentage determination, as to the number of jobs that were based on published statistical sources, but did identify several published sources that she relied on in formulating the job numbers, including "Department of Labor website, United States Department of Labor, Connecticut Department of Labor, the "LES," salary surveys, professional organizations, regional job listings, labor market surveys, employer sampling, situational assessments, informational interviews, and the Standard Occupational Classification." (Tr. at 61).

## C. Medical Records.

The medical records submitted by Plaintiff are dated from 1987 through 2010. (Tr. 324–802). The medical records describe both the mental and the physical impairments indicated in the following sections. The physical and mental issues will be separated and described chronologically.

### 1. Mental Health.

On July 12, 1987, Plaintiff was discharged from the Institute of Living. (Tr. at 479). The discharge diagnosis indicated that Plaintiff had alcohol abuse, cocaine abuse, and hallucinogen abuse, all in remission, and adjustment disorder with depressed mood. (Tr. at 479).

On April 20, 1988, the Plaintiff was again discharged from the Institute of Living. (Tr. at 476). The discharge diagnosis on that date indicated the Plaintiff had borderline personality disorder, episodic cocaine abuse, continuous alcohol abuse, and major depression. (Tr. at 476). There are no further records of treatment at the Institute of Living.

On June 30, July 10, August 7, September 4, September 18, 2008, and September 23, 2008, Plaintiff was seen at Community Health Services ("CHS") by a licensed clinical social worker. (Tr. at 438–40, 442–44). During the September 4, 2008 meeting, Plaintiff was referred for a psychiatric evaluation, (Tr. at 440), which took place on September 23, 2008. (Tr. at 428). Plaintiff was diagnosed by Dr. Julie Volpe with recurrent major depression, and it was noted that she had passive suicidality. (Tr. at 429). Dr. Volpe indicated that the Plaintiff had a Global Assessment of Functioning ("GAF") score of 48.[1] (Tr. at 429). Plaintiff was prescribed a daily regimen of Cymbalta to control the depression. (Tr. at 429). At that time, Plaintiff reported to CHS that she had stopped all her medications, with exception of her psychiatric medications. (Tr. at 433).

On October 2, 2008, the Plaintiff was seen by a psychiatrist at CHS, who switched her medication from Cymbalta to Celexa because of adverse side effects. (Tr. at 436). On October 20, November 17, and December 11, 2008, Dr. Volpe indicated that Plaintiff showed improvement on her current medication and that she showed no evidence of suicidality. (Tr. at 435, 459, 461).

At a February 5, 2009, psychiatric visit to Dr. Volpe, Plaintiff was found to have increasing depression symptoms and was prescribed an increased dose of Celexa. (Tr. at 661). On February 28, 2009, the Plaintiff was taken to Eastern Maine Medical Center following acute mental status changes. (Tr. at 695). The final impression of the treating physician's assistant, Paul Spencer, was that the Plaintiff possibly took her sedating medications to excess. (Tr. at 696). On March 5, April 6,

April 28, and May 8, 2009, Plaintiff again saw Dr. Volpe, who noted no significant changes in Plaintiff's mental status at any of those times. (Tr. at 674, 683, 685, 693).

### 2. Physical Health.

#### a. Low Back.

On August 20, 1998, and October 6 and October 11, 1999, the Plaintiff was treated for low back pain, and was given pain medications to treat it. (Tr. at 334, 335, 340).

On July 17, 2000, Plaintiff was involved in a motor vehicle accident and treated at Hartford Hospital. (Tr. at 331–33). Plaintiff was diagnosed with a cervical strain and chest trauma, with negative x-rays findings for both. (Tr. at 331–32, 362).

On December 12, 2001, and October 10, 2003 Plaintiff was treated at Hartford Hospital for low back pain and discharged with medications for pain. (Tr. at 329, 330).

On December 21, 2005, the Plaintiff was treated at Hartford Hospital for a complaint of back pain. (Tr. at 327). The treatment record indicates that the Plaintiff had a poor range of motion in all directions, and that she was walking with the use of a cane at the time. (Tr. at 327). She was diagnosed with lumbar pain, and treated with ibuprofen and robaxin. (Tr. at 327). On June 6, 2007, the Plaintiff was treated at Hartford Hospital following a June 1 fall down stairs. (Tr. at 324). Plaintiff was complaining of back pain, which was diagnosed as a muscle spasm, for which she was treated with ibuprofen, and robaxin. (Tr. at 324).

On April 17, 2008, Plaintiff underwent lumbar spine radiological readings at

---

1. A GAF of 41–50 indicates serious symptoms or serious impairments in social, occupational or school functioning. *Diagnostic and Statistical Manual of Mental Disorders* 34–35 (4th ed. 2000) ("DSM–IV").

Hartford Hospital. (Tr. at 394). The findings indicated no acute injury but found facet arthopathy[2] of the lower lumbar spine. (Tr. at 394). Plaintiff followed up with CHS on April 30, 2008, and was treated for her complaints of neck and back pain. (Tr. at 399). Again, on June 4, 2008, Plaintiff was treated at Hartford Hospital for back pain. (Tr. at 373).

On June 12 and June 26, 2008, the Plaintiff was seen at CHS for complaints of back pain. (Tr. at 413, 414). On August 9 and August 11, 2008, the Plaintiff was treated at Hartford Hospital for back pain. (Tr. at 550, 552).

On December 11, 2008, the Plaintiff was evaluated at St. Francis Center for Rehabilitation and Sports Medicine, receiving a total of eight therapy session for her back, continuing through January 23, 2009. (Tr. at 671). Plaintiff was described as having made good progress with therapy and was discharged on March 2, 2009. (Tr. at 671).

On March 5, 2009, the Plaintiff went to CHS for back pain. (Tr. at 672). On March 16, 2009, the Plaintiff went to St. Francis Hospital for left-sided back pain but left before being treated. (Tr. at 625). On April 2 and April 30, 2009, the Plaintiff was again seen at CHS for back pain. (Tr. at 677, 686).

### b. Knees.

On July 6, 2004, the Plaintiff was treated at Hartford Hospital for knee pain. (Tr. at 328). An x-ray was performed on her left knee, indicating no dislocation or fracture. (Tr. at 328, 346). The x-ray of Plaintiff's left knee did indicate moderate degenerative changes including some joint space narrowing, marginal osteophytes all compartments,[3] and moderate joint effusion.[4] (Tr. at 346). Plaintiff was prescribed ibuprofen for pain, given a knee brace, and told to follow up with orthopedic evaluation. (Tr. at 328).

On May 3, 2009, the Plaintiff was treated at Hartford Hospital, complaining of pain in the right knee, and diagnosed with knee pain and effusion of the right knee. (Tr. at 786).

### c. Left Shoulder.

On June 4, 2008, Plaintiff was treated at Hartford Hospital for complaints of shoulder pain. (Tr. at 373–4).

On September 15, 2008, the Plaintiff was seen at St. Francis Hospital for left shoulder pain. (Tr. at 598). X-rays of the left shoulder indicated no fracture, no dislocation, and no degenerative changes present. (Tr. at 599). The Plaintiff was discharged with after-care instructions for a rotator cuff injury. (Tr. at 600).

On December 4, 2008, the Plaintiff was treated at CHS following a fall one week prior. (Tr. at 470). The Plaintiff was complaining of left side pain and dizziness. (Tr. at 470). At that visit, the Plaintiff was diagnosed with a left shoulder contusion. (Tr. at 470).

In January of 2009, the Plaintiff was prescribed outpatient rehabilitation therapy for left shoulder tendonitis. (Tr. at 612). The Plaintiff received outpatient therapy at the St. Francis Center for Rehab and Sports Medicine on January 27, February 5, February 9, February 11,

---

**2.** "Arthopathy" is any disease affecting a joint. *Stedman's Medical Dictionary* 150 (26th ed. 1995).

**3.** "Osteophytes. Bony outgrowths or protuberances." *Stedman's Medical Dictionary* at 1270.

**4.** "Effusion. Increased fluid in synovial cavity of joint." *Stedman's Medical Dictionary* at 1270.

February 16, and February 19, 2009. (Tr. at 618–20).

On May 12, 2009, the Plaintiff had magnetic resonance imaging of her left shoulder, indicating a partial distal bursal tear in the Plaintiff's rotator cuff. (Tr. at 694).

### d. Right Hand.

X-rays of Plaintiff's right hand at Inland Hospital, Maine, on April 15, 2009, revealed degenerative osteoarthritic changes in the interphalangeal joints to the digits, "particularly prominent involving the distal interphalangeal joints to the index, middle, and 5th digits of the right hand." (Tr. at 721).

### e. Right Hip.

X-rays of Plaintiffs right hip, also at Inland Hospital, Maine, on April 15, 2009, revealed early degenerative arthritic changes with lipping along the superolateral acetabular rim, but otherwise no acute findings. (Tr. at 722).

### f. Heart.

Plaintiff was given an electrocardiogram ("EKG," or "ECG")[5] on May 2, 2007, at Hartford Hospital. (Tr. at 349). The EKG showed a normal sinus rhythm, prolonged QT, and abnormal ECG.[6] (Tr. at 349). Two EKG's were performed on Plaintiff on April 16, 2008, also at Hartford Hospital. (Tr. at 349, 388). The first EKG, at 3:43 p.m., showed normal sinus rhythm, nonspecific ST and T wave abnormality, prolonged QT, and abnormal ECG. (Tr. at 349, 388). The second EKG, at 9:07 p.m., showed normal sinus rhythm, minimal voltage criteria for left ventricular hypertrophy ("LVH") (possible normal variant), nonspecific T wave abnormality, and abnormal ECG. (Tr. at 349, 386, 388).

On October 23, 2007, the Plaintiff was treated for chest pain at St. Francis Hospital. (Tr. at 563). Plaintiff was given an EKG that indicated LVH, and a normal sinus rhythm. (Tr. at 571). Plaintiff had a chest x-ray that did not indicate any abnormalities. (Tr. at 573). A stress EKG, performed on October 24, 2007, after the Plaintiff was admitted to St. Francis, demonstrated no changes. (Tr. at 585).

Plaintiff's discharge summary from Hartford Hospital, dated April 19, 2008, described Plaintiff as having moderate concentric LVH with normal left ventricular ejection fraction ("LVEF"), and normal diastolic function. (Tr. at 367, 369, 393). Plaintiff had a positive cardiac stress test. (Tr. at 367, 370, 391). She had two (2) medium sized partially reversible defects in the lateral and inferior regions suggestive of multi-vessel disease, question of right coronary artery ("RCA") and circumflex disease. (Tr. at 367). Plaintiff was referred to cardiac catheterization, where she was found to have non-obstructive coronary artery disease and seventy (70) percent renal artery stenosis. (Tr. at 367, 371, 395–7). The discharge summary also indicates that the Plaintiff was discharged with a 30–day loop monitor to detect any ventricular arrhythmia or supraventricular arrythmia to explain her syncope.[7] (Tr. at 367).

Plaintiff received another EKG on June 4, 2008, at Hartford Hospital, showing a

---

**5.** EKG, and ECG are abbreviations for electrocardiogram. *Stedman's Medical Dictionary* at 539, 549.

**6.** ECG's measure the electrical activity of a patient's heart. The measurement is comprised of three waves, which have been named P, QRS (a wave complex), and T. Euan A. Ashley & Josef Niebauer, *Cardiology Explained,* Ch. 3 Conquering the ECG (2004), available at http://www.ncbi.nlm.nih.gov/books/NBK2214/

**7.** "Syncope" is fainting or unconsciousness of any cardiac cause. *Stedman's Medical Dictionary* at 1720.

normal sinus rhythm, ST and T wave abnormalities, possible inferolateral ischemia, LVH with ST–T changes, and abnormal ECG. (Tr. at 400).

On August 9, 2008, Plaintiff was admitted to Hartford Hospital. (Tr. at 550). The discharge notes from that admission indicate that an EKG was performed that showed normal sinus rhythm with T-wave inversion, asymmetrical downsloping suggestive of LV strain pattern in V3 to V6 and II, III, and aVF. (Tr. at 550). The Plaintiff also underwent a CT angio scan that did not show any significant findings. (Tr. at 550).

Plaintiff was then seen at University of Connecticut Health Center on August 26, 2008. (Tr. at 427). Dr. James Menzoian indicated that the Plaintiff was morbidly obese and that an arteriogram, a possible right renal angioplasty and stent replacement were planned. (Tr. at 427).

On October 8, 2008, Plaintiff received another EKG at Hartford Hospital. (Tr. at 431). This EKG concluded that her left ventricular systolic function was normal, she had mild LVH, and she had a hemodynamic effect for impaired ventricular relaxation. (Tr. at 431).

On October 13, 2008, Plaintiff was treated at University of Connecticut Health Center. (Tr. at 528). Angiography was performed on the Plaintiff's renal arteries and angioplasty and stenting were performed on the right renal artery to normalize the luminal diameter. (Tr. at 528).

On December 18, 2008, the Plaintiff went to CHS for an office visit. (Tr. at 469). At that time Plaintiff's hypertension was controlled. (Tr. at 469).

On April 16, 2009, the Plaintiff had a follow up visit with the Hartford Hospital Cardio Clinic. (Tr. at 640). Plaintiff's EKG showed sinus bradycardia, nonspecif-ic T wave abnormality, and abnormal ECG. (Tr. at 640).

### g. Liver.

On November 4, 2008, the Plaintiff had blood work performed, indicating the presence of Hepatitis C antibodies. (Tr. at 457). A subsequent blood specimen from the Plaintiff, collected on November 26, 2008, indicated a Hepatitis C infection. (Tr. at 454).

On December 29, 2008, an abdominal ultrasound at Connecticut Valley Radiology, indicated that the Plaintiff had an enlarged liver. (Tr. at 446).

Plaintiff was seen at CHS on January 5, 2009. (Tr. at 468). Progress notes indicated a diagnosis of cirrhosis, Hepatitis C, hypertension, and tobacco use. (Tr. at 468).

On January 8, 2009, the Plaintiff received an abdominal CT with and without contrast at Connecticut Valley Radiology. (Tr. at 657). The radiology report found mild hepatomegaly, and no suspicious masses. (Tr. at 657).

On July 15, 2009, the Plaintiff had a liver biopsy requisition performed at St. Francis Hospital, indicating chronic hepatitis consistent with chronic Hepatitis C. (Tr. at 789).

### h. Sleep Disorder.

On October 24, 2008, Plaintiff was found to have mild obstructive sleep apnea following an overnight polysomnogram performed by St. Francis Hospital Sleep Lab. (Tr. at 604).

On November 25, 2008, the Plaintiff underwent a continuous positive airway pressure ("CPAP") titration study. The study indicated poor sleep quality with reduced sleep efficiency, prolonged sleep latency and absence of slow wave sleep. (Tr. at 447). The study concluded that the Plain-

tiff's obstructive sleep apnea was well controlled with the use of CPAP. (Tr. at 447).

### 3. State of Connecticut Department of Social Services Medical Report.

On June 13, 2008, Phyllis Schling, APRN, and Dr. Dennis Morgan, MD, prepared a medical report on Plaintiff for the Connecticut Department of Social Services. (Tr. at 700–7). The report indicated that Plaintiff would be unable to work for a period of 12 months or more, and approximated the date of onset as October 2007. (Tr. at 700). The diagnoses relied upon were hypertension, hyperlipidemia, arthritis, and low back pain. (Tr. at 701). The diagnosis of low back pain was supported by the Plaintiff's decreased range of motion and the noted facet arthopathy from prior radiologic reports. (Tr. at 701).

The report opined that Plaintiff was only capable of sitting for one (1) hour during an eight (8) hour workday, and could never stand or walk. (Tr. at 701). The report also opined that the Plaintiff could lift and carry only five (5) pounds occasionally, and that the Plaintiff could use her hands to perform simple grasping, but could not use push and pull arm controls or perform fine manipulation. (Tr. at 702).

The report opined that the Plaintiff could not use her feet for push and pulling leg controls, and could never bend, squat, crawl, climb, or reach. (Tr. at 702). The report's authors believed that the Plaintiff should never be involved in any of the following: unprotected heights, being around machinery, exposure to marked changes in temperature and humidity, driving automotive equipment, and exposure to dust and fumes. (Tr. at 703).

The report found that the Plaintiff had mental health or substance abuse issues that impacted her ability to work, but failed to make the necessary summary to support the conclusion. (Tr. at 703). The report indicated that Plaintiff's disorder was an exacerbation of a chronic illness. (Tr. at 703). Four of the Plaintiff's medications, including hydrochlorothiazide, metoprolol, amlodipine besylate, and simvastatin, are listed in the report and were not found to affect the Plaintiff's ability to work. (Tr. at 707).

Plaintiff was also required to self-report her state of health, which she said had become worse lately. (Tr. at 708). She then reported that she felt sad a lot of the time; had problems sleeping; was not interested in activities she usually liked; felt guilty or worthless; had a change in appetite; felt nervous all the time; had problems staying awake during the day; had problems concentrating or thinking; had no energy; and thought about hurting herself or others. (Tr. at 709).

Plaintiff reported that she had not been drinking alcohol or using drugs, (Tr. at 709); that she often did the following activities: sitting, standing, walking, bending, lifting, grasping, pushing, and pulling; that she could plan meals, cook, read, watch television, listen to music, visit people, count change, talk on the phone, do arts and crafts, sew, and walk; but that she could not play sports, ride a bicycle, use a computer, play video games, exercise, household chores, paint or draw, knit or crochet, and jog. (Tr. at 710).

The Plaintiff represented that she had no problems paying attention, learning new things, remembering, organizing, reading, going outside, and getting along with others. (Tr. at 710). She did identify some problems with listening, but she did not provide a description of what she meant. (Tr. at 710). The Plaintiff also noted that her health problems began in April 2008. (Tr. at 711).

### 4. Physical Residual Functional Capacity Assessment.

On August 26, 2008, Dr. Arthur Waldman completed a physical residual func-

tional capacity ("RFC") assessment. (Tr. at 419–26). Dr. Waldman's notes indicate he relied on the medical evidence of record ("MER") from CHS, for visits on April 30, May 22, and June 26, 2008. (Tr. at 426). MER was also supplied from Hartford Hospital for the dates of April 16–19, June 4, and June 13, 2008. (Tr. at 426).

The RFC assessment indicated that the Plaintiff's primary diagnosis was coronary artery disease (CAD), secondary diagnosis was hypertension (HTN), and that Plaintiff also had renal artery stenosis. (Tr. at 419).

Dr. Waldman found the Plaintiff's exertional limitations to include occasionally lifting 20 pounds, frequently lifting 10 pounds, standing and/or walking about six (6) hours per eight (8) hours workday, sitting with breaks for six (6) hours per eight (8) hours workday, and pushing and/or pulling of hand/foot controls unlimited. (Tr. at 420).

Dr. Waldman also concluded that the Plaintiff's postural limitations were occasionally climbing, never balancing, occasionally stooping, occasionally kneeling, occasionally crouching, and occasionally crawling. (Tr. at 421).

Further, Dr. Waldman opined that the Plaintiff had no manipulative, visual, or communicative limitations. (Tr. at 422–3). Dr. Waldman's findings included the following environmental limitations for the Plaintiff: avoiding concentrated exposure to extreme cold, and avoid concentrated exposure to hazards such as machinery or heights. Dr. Waldman did not describe in any detail how the medical record supported his findings. (Tr. at 419–26).

**5. Dr. Volpe's Evaluation Forms.**

On July 16, 2009, Dr. Julie Volpe, MD, completed a Psychiatric Evaluation Form for Affective Disorders regarding the Plaintiff.

The face of the form stated that the required level of severity for affective disorders is met when the requirements in both sections A and B are satisfied, or when the requirements of section C are met. Dr. Volpe indicated that the Plaintiff satisfied the requirements of section A, finding the Plaintiff suffered from a depressive syndrome characterized by anhedonia, sleep disturbance, decreased energy, and feelings of guilt or worthlessness. (Tr. at 766).

Dr. Volpe found that sections B and C did not apply to the Plaintiff. (Tr. at 766–7). Dr. Volpe reported that she had been seeing the Plaintiff once per month for a period of nine (9) months, and the Plaintiff suffered from major recurrent depression. (Tr. at 767). Dr. Volpe reported that the Plaintiff had neither suffered a loss in cognitive abilities nor demonstrated a bipolar syndrome. (Tr. at 767–8). Dr. Volpe indicated that the Plaintiff did not suffer from any "marked" or "severe" impairments, as defined on the form.[8] (Tr. at 768).

The Plaintiff was described as having moderate impairment with getting along in social situations, interacting and participating in group activities, and sustaining tasks without interruption. (Tr. at 770).

---

8.
Social Security evaluates the severity of impairments as non, slight, moderate, marked and extreme. (These severity categories differ from those in the DSM–IV) Marked is defined as more than moderate and less than extreme, and a marked limitation is one where the degree of impairment seriously interferes with the person's ability to function independently *and* appropriately *and* on a sustained basis. By comparison, a "slight" impairment is one that does not seriously effect the ability to function, and an "extreme" impairment is on that is more severe than "marked."
(Tr. at 768) (emphasis in original).

Dr. Volpe reported that the Plaintiff, either continuously or intermittently, in stressful situations, displayed the following: withdrawal from situations, exacerbation of signs of illness, exacerbation of signs of illness. (Tr. at 770). Dr. Volpe opined that the Plaintiff experienced repeated episodes of decompensation, where the Plaintiff's depression symptoms increase during periods of stress. (Tr. at 771). Dr. Volpe expected that the Plaintiff's mental condition would last for at least 12 months at the severity level described. (Tr. at 772).

Dr. Volpe also completed a Medical Source Assessment summarizing her conclusions, on July 16, 2009. (Tr. at 773). Dr. Volpe opined that, without limitation, the Plaintiff could remember locations and work-like procedures; understand and remember very short, simple instructions; carry out very short and simple instructions; maintain regular attendance, be punctual, sustain ordinary routine, make simple work-related decisions, ask simple questions, get along with coworkers or peers without distracting them, maintain socially appropriate behavior and adhere to basic standards of neatness, be aware of normal hazards, and travel to unfamiliar places. (Tr. at 773–75).

Dr. Volpe further opined that the Plaintiff could perform the following tasks with noticeable difficulty no more than ten (10) percent of the work day or work week: understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods of time, perform activities within a schedule, work in coordination or proximity to others without being distracted by them, complete a normal workday and workweek with interruptions from psychological based symptoms, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, respond appropriately to changes in the work setting, and set realistic goals. (Tr. at 773–5).

### 6. APRN Kathleen Tummillo's Evaluation.

On July 24, 2009, Kathleen Tummillo, an APRN at CHS, completed a Physical Residual Functional Capacity Questionnaire regarding the Plaintiff. (Tr. at 778).

Ms. Tummillo noted that she first saw the Plaintiff on February 12, 2009, after a referral for a Hepatitis C consult. (Tr. at 778). Ms. Tummillo listed the Plaintiff's symptoms as left shoulder pain, hypertension, depression, and right knee "swelling." (Tr. at 778). No clinical findings or objective signs were included in the report to support any diagnoses of the Plaintiff. (Tr. at 778). Ms. Tummillo went on to opine that the Plaintiff's pain or experience of symptoms would interfere with Plaintiff's concentration and attention needed to perform simple work tasks 34 to 66 percent of the workday.

Ms. Tummillo further opined that the Plaintiff could only walk a single city block, sit for no more than two (2) hours consecutively, and stand for no more than 20 minutes consecutively. (Tr. at 779). Ms. Tummillo opined that the Plaintiff could only sit about two (2) hours total, and stand/walk less than two (2) hours total in an eight (8) hour workday. (Tr. at 779). Ms. Tummillo then concluded that the Plaintiff needed periods of walking approximately every 20 minutes during an eight (8) hour workday. (Tr. at 779). No opinion was offered on the question of whether Plaintiff needed a job that permitted shifting positions at will from sitting, standing, or walking, but Ms. Tummillo noted in the margin of the report, "[t]his need to be evaluated orthopedic [sic]." (Tr. at 779).

The report offered the opinion that the Plaintiff could never lift and carry anything weighing ten (10) pounds or more; or stoop, crouch, or climb ladders; could occasionally look down, turn head left and right, look up, and hold head in a static position; could rarely twist; and could occasionally climb stairs. (Tr. at 780). The report opined the Plaintiff had no significant limitations on reaching, handling, or fingering. (Tr. at 780). Ms. Tummillo opined that the Plaintiff will likely have "good days" and "bad days," and will likely miss an average of more than five days per month from work. (Tr. at 781). Ms. Tummillo offered no opinion as to the onset of the Plaintiff's symptoms and limitations. (Tr. at 780).

### 7. Dr. Gaeta's Medical Interrogatories.

On April 10, 2010, Dr. Gaeta, MD, provided answers to a list of medical interrogatories regarding the Plaintiff's medical history. Dr. Gaeta concluded that the Plaintiff's medical impairments were coronary artery disease and hypertensive heart disease. (Tr. at 800). Dr. Gaeta did not cite any objective medical findings or the case record in support of his conclusions. (Tr. at 800–2). Ultimately, Dr. Gaeta offered the opinion that the Plaintiff did not meet or equal any of the impairments in the SSA Listing of Impairments.[9] (Tr. at 801).

Dr. Gaeta was therefore asked to identify any functional limitations of the Plaintiff, and provided the following summary:

In view of history of hypertension which has been significant with findings of left ventricular hypertrophy by EKG and echocardiogram, claimant would be limited to generally light physical activities. May lift or carry 10 lbs frequently, 20 lbs occasionally. No limits on sitting or standing. May walk at 20 minute stretches. Should avoid extremes of cold [and] heat. No limitations re[garding] sensory, manipulative, or postural functions.

(Tr. at 802).

### IV. DISABILITY UNDER THE ACT.

 To qualify as disabled under the Act, an individual must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1). The Act does not contemplate degrees of disability or allow for an award based on partial disability. *Stephens v. Heckler,* 766 F.2d 284, 285 (7th Cir.1985).

 Such a "physical or mental impairment" must be supported by medically acceptable clinical and laboratory techniques. 42 U.S.C. § 423(d)(3). The facts considered in determining disability are the objective medical facts; the diagnoses or medical opinions that can be inferred from these facts; subjective evidence of pain or disability; and the educational background, age, and work experience of the claimant. *Mongeur v. Heckler,* 722 F.2d 1033, 1037 (2d Cir.1983). In order to be eligible for disability benefits, a person must have insured status under the program, have not reached the statutory retirement age, have filed an application for benefits, and have been determined to be disabled as defined in the Act. 42 U.S.C. § 423(a)(1).

---

9. Social Security Administration Listing of Impairments—Adult Listings, *available at* http://www.ssa.gov/disability/professionals/ bluebook/AdultListings.htm (last reviewed or modified June 7, 2011).

## V. *ANALYTICAL FRAMEWORK AND ALJ DECISION.*

The ALJ follows a five-step process to determine whether a claimant is disabled. *Balsamo v. Chater*, 142 F.3d 75, 79–81 (2d Cir.1998). First, the ALJ must determine if the claimant is currently engaged or has been gainfully employed at any point since the onset of the claimed disability. *See* 20 C.F.R. § 404.1520(b). If not, the ALJ must decide if the claimant has a "severe impairment" that significantly limits his "physical or mental ability to do basic work." *See* 20 C.F.R. § 404.1520(c). If the impairment is severe as listed in Appendix 1 of the SSA administrative regulations or is equivalent to a listed impairment, the claimant is presumed disabled. *See* 20 C.F.R. § 404.1520(d). If the claimant's impairment is severe but not listed, a finding of "not disabled" is directed if the ALJ determines the claimant possesses the "residual functional capacity" to perform his past relevant work. *See* 20 C.F.R. § 404.1520(e)-(f). If unable to perform past work, the Commissioner must decide if there is other work the claimant is able to perform. *See* 20 C.F.R. § 404.1520(g).

The claimant bears the burden of proof with respect to the first four steps of analysis. *See* 42 U.S.C. § 423(d)(5). If the claimant demonstrates an inability to perform past work, the burdens shifts to the Commissioner to show that there exists work that the claimant can perform. *Balsamo*, 142 F.3d at 80; *Rivera v. Schweiker*, 717 F.2d 719, 722–23 (2d Cir. 1983). This may require the application of the Medical–Vocational Guidelines ("the grid"), which places claimants with severe exertional impairments, who can no longer perform past work, into grid categories according to their residual functional capacity, age, education and work experience, and dictates a conclusion of disabled or not disabled. *See* 20 C.F.R. §§ 404.1520(f), 404.1562. As always, in evaluating any disability claims, "the Commissioner must consider four factors: 1) objective medical facts, 2) diagnoses or medical opinions based on these facts, 3) subjective evidence of pain and disability, and 4) the claimant's educational background, age, and work experience." *Mongeur*, 722 F.2d at 1037.

Applying the five-step framework in this case, ALJ Heiser made the following findings of fact and conclusions of law: (1) that the Plaintiff met the insured status requirements of the Social Security Act through March 31, 2011, (Tr. at 12); (2) that the Plaintiff had not engaged in substantial gainful activity since December 1, 2007, the amended alleged onset date of the Plaintiff's disability, (Tr. at 12); (3) that the Plaintiff had the following severe impairments: hypertensive heart disease, depression, obesity, renal artery stenosis, arthritis, chronic hepatitis, and a partial bursal tear of the left shoulder, (Tr. at 13); and (4) that the Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1, (Tr. at 13).

ALJ Heiser further concluded that (5) the Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b), with the following limitations: can occasionally bend, climb stairs, balance, stoop, kneel, crouch and crawl; cannot climb ladders, frequently reach above shoulder level with the left arm; cannot be exposed to moving machinery, unprotected heights, or extreme cold or heat; and is limited to tasks involving short, simple instructions in an environment with few workplace changes and no public contact. (Tr. at 14).

ALJ Heiser then concluded (6) that the Plaintiff was unable to perform any past

relevant work, (Tr. at 18); (7) that the Plaintiff was an individual closely approaching advanced age on the amended alleged disability onset date, (Tr. at 18); (8) that the Plaintiff had limited education and was able to communicate in English, (Tr. at 18); (9) that transferability of jobs was not an issue in Plaintiff's case, (Tr. at 19); and (10) that considering the Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the Plaintiff could perform. (Tr. at 19).

ALJ Heiser's final conclusion was that the Plaintiff was not under a disability, as defined in the Act, from December 1, 2007, through May 21, 2010. (Tr. at 20).

## VI. *DISCUSSION.*

The Plaintiff asserts a number of errors in the ALJ's decision. For the reasons stated, Plaintiff's Motion for Judgment is denied, and Defendant's Motion to Affirm the Decision of the Commissioner is granted.

### A. **Treating physician rule and medical source opinions.**

First, the Plaintiff claims that the ALJ failed to giver proper weight to the various medical opinions in the record.

The treating physician rule, promulgated in 20 C.F.R. §§ 404.1527, 416.927, "mandates that the medical opinion of a claimant's treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence." *Shaw v. Chater,* 221 F.3d 126, 134 (2d Cir.2000); *see* 20 C.F.R. §§ 404.1527(d), 416.927(d).

However, a "treating physician's statement that the claimant is disabled cannot itself be determinative" because that determination is reserved to the Commissioner. *Snell v. Apfel,* 177 F.3d 128, 133 (2d Cir.1999); *see also* 20 C.F.R.

§§ 404.1527(e)(1), 416.927(e)(1). If a treating physician's opinions are not given controlling weight, then the following factors are to be applied in determining the weight assigned: the examining relationship, the treatment relationship, the supportability of the opinion, consistency, specialization of the physician, and other factors brought to the attention of the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d). The ALJ must provide "good reasons" for the weight that is given a treating physician's opinion. *See Halloran v. Barnhart,* 362 F.3d 28, 32-3 (2d Cir.2004).

### 1. Dr. Volpe

■ The Plaintiff first claims that although ALJ's opinion says great weight was given to the treating source opinions of Dr. Volpe, Dr. Volpe's opinions were not given controlling weight. (Pl.'s Mot. For Judgment 18). The Court disagrees with the Plaintiff and finds that the ALJ did in fact give proper weight to the opinion of Dr. Volpe.

The Plaintiff claims that the ALJ disregarded Dr. Volpe's September 23, 2008 assessment, in which the Plaintiff was found to have a GAF score of 48. Plaintiff asserts that Dr. Volpe's September 23, 2008 assessment was inconsistent with Dr. Volpe's subsequent Psychiatric Evaluation Form, and the ALJ was therefore required to re-contact the treating physician for clarification, per Social Security Ruling ("SSR") 85-16.

The Court agrees with the DRB, that the Psychiatric Evaluation Form completed by Dr. Volpe on July 16, 2009, was not inconsistent with the Dr. Volpe's previous assessment of a GAF score of 48. The Psychiatric Evaluation Form was completed ten months after the GAF was assessed, based on Dr. Volpe's treatment history with the Plaintiff. Dr. Volpe

opined in the evaluation that the Plaintiff had experienced repeated episodes of decompensation, which would be consistent with the Plaintiff's exacerbated depression on September 23, 2008, but that the episodes of decompensation were not of extended duration.

Because the Court finds Dr. Volpe's conclusions in the Psychiatric Evaluation Form consistent with the Plaintiff's treatment history, the ALJ would not have been required to recontact Dr. Volpe for clarification under SSR 85–16. SSR 85–16 requires that a treating source physician be re-contacted where the notes of the treating physician are incomplete, and there is a need for more detailed information. SSR 85–16, 1995 WL 56855 at *3. As there is no inconsistency between Dr. Volpe's opinion on the Psychiatric Evaluation and previous treatment, and the evaluation does not appear to be incomplete, the ALJ was under no duty to re-contact Dr. Volpe.

Plaintiff also asserts that the ALJ failed to give proper weight to the opinion of Dr. Volpe because the ALJ would have been expected to make a finding of disability pursuant to SSR 85–15.

The purpose of SSR 85–15 is to emphasize:

(1) that the potential job base for mentally ill claimants without adverse vocational factors is not necessarily large even for individuals who have no other impairments, unless their remaining mental capacities are sufficient to meet the intellectual and emotional demands of at least unskilled, competitive, remunerative work on a sustained basis; and (2) that a finding of disability can be appropriate for an individual who has a *severe* mental impairment which does not meet or equal the Listing of Impairments, even where he or she does not have adversities in age, education, or work experience.

SSR 85–15, 1985 WL 56857 at *1 (emphasis supplied).

Nowhere in Dr. Volpe's evaluation did she identify the Plaintiff as having any severe mental impairment. Therefore, the ALJ was under no obligation to discuss or apply SSR 85–15. SSR 85–15 would have applied had the Plaintiff been found to have *severe* mental impairments that failed to equal or meet the listed criteria for a finding of disability due to mental impairment. *See id.* The ALJ's lack of discussion of SSR 85–15 gives no support to the notion that the ALJ was not giving proper weight to Dr. Volpe's opinion, as SSR 85–15 was not directly relevant in this case.

### 2. Dr. Morgan

The Plaintiff next asserts that the opinion of Dr. Morgan should be given controlling weight as a treating source opinion. The Court disagrees and affirms the decision of the Commissioner with respect to the weight afforded Dr. Morgan's opinion.

According to SSR 96–2p, a treating source's opinion is given controlling weight when it is "well-supported" by medically acceptable clinical and laboratory diagnostic techniques, and the opinion is "not inconsistent" with other medical evidence of record. SSR 96–2p, 1996 WL 374188 at *1.

The Plaintiff asserts the ALJ wrongly concluded that Dr. Morgan's opinions were not supported by objective medical evidence. The ALJ gave little weight to the opinion of Dr. Morgan because the form in which the opinions were expressed indicated that the opinions were based on the Plaintiff's diagnoses of hypertension, hyperlipidemia, arthritis and low back pain. Plaintiff also claims that Dr. Morgan's opinion on the Plaintiff's limitations as to

fine manipulation was supported ·by objective medical evidence, namely Ex. 29F. (Tr. at 721). The DRB affirmed the ALJ's decision to give little weight to Dr. Morgan's opinion because Dr. Morgan did not point to objective medical evidence that would support his opinions.

Ex. 29F does provide some objective evidence that could support a finding of limitation with respect to the Plaintiff's ability to do fine manipulation, and is consistent with the treating source's opinion.[10] However, Dr. Morgan's opinion was given on June 13, 2008, while the x-ray was administered on April 15, 2009. Dr. Morgan's opinion could not have been based upon the results of this x-ray, as it was not yet part ·of Plaintiff's medical record. Nowhere in the report does Dr. Morgan indicate upon what he was relying in making the determination that the Plaintiff had limitations on fine manipulation.

While · Dr. Morgan's opinions are not inconsistent with medical evidence of record, his opinions were not well-supported and are therefore not entitled to controlling weight under SSR 96–2p.

### 3. Dr. Gaeta

The Plaintiff asserts that the opinion of Dr. Gaeta should be given no weight with respect to the Plaintiff's limitations related to arthritis, back . pain, sleep apnea, and Hepatitis C, because Dr. Gaeta was retained only for opinions on Plaintiff's heart conditions. The Court agrees with the Plaintiff, and finds no evidence that the opinion of Dr. Gaeta was relied on in any way with respect to the limitations mentioned above. Dr. Gaeta's medical opinions as to Plaintiff's limitations were based upon Dr. Gaeta's understanding of the Plaintiff's heart conditions. The ALJ, when referring to Dr. Gaeta's opinions,

said "the claimant's *heart conditions* allow" for the determined residual functional capacity. (Tr. at 17) (emphasis supplied).

### 4. Kathleen Tummillo, APRN.

The Plaintiff next asserts that the ALJ failed to give proper weight and consideration to the opinion of Kathleen Tummillo, APRN, in violation of SSR 06–03p. The Court finds the ALJ's determination that Ms. Tummillo's opinion be given little weight is well supported.

SSR 06–03p clarifies how the Commissioner will consider opinions from sources that are not "acceptable medical sources." SSR 06–03p distinguishes between "acceptable medical sources" and "other sources" because (1) "acceptable medical sources" are necessary to provide evidence of medically determinable impairments; (2) only "acceptable medical sources" can give medical opinions; and (3) only "acceptable medical sources" can be treating sources whose medical opinions can be afforded controlling weight. SSR 06–03p, 2006 WL 2329939.

An Advanced· Practice Registered Nurse (APRN) does not fall within the category of "acceptable medical sources." *See id.* at *1. Nonetheless, all relevant evidence in the case record is required to be considered. *Id.* at *4; 20 C.F.R. § 404.1527(b). The weight accorded the evidence varies based on the following factors: length and frequency of treatment relationship, consistency with other evidence, degree to which relevant evidence is offered in support of an opinion, how well the source explains an opinion, whether the source has expertise related to the impairment, and other relevant information. SSR 06–03p, 2006 WL 2329939 at *4.

---

**10.** The x-ray referred to in Ex. 29F, of the Plaintiff's right hand, indicates degenerative osteoarthritic changes to the interphalangeal joints. (Tr. at 721).

In the case of Ms. Tummillo's opinions on the severity of the Plaintiff's impairments, Ms. Tummillo offered no explanation for her opinion, and cited no relevant evidence in support of it. In determining that Ms. Tummillo's opinion be afforded little weight, the ALJ expressly indicated that Ms. Tummillo was not an acceptable medical source, and no basis was given for her opinion of severe restrictions. (Tr. at 18). The ALJ's remarks were a proper application of SSR 06–03p in determining the weight given to other sources that are not acceptable medical sources.

The Court also notes that Ms. Tummillo only began seeing the Plaintiff on February 12, 2009, indicating a relatively short treatment history with the Plaintiff. Further, the Plaintiff was referred to Ms. Tummillo for treatment regarding the Plaintiff's Hepatitis C infection. Nothing in the record indicates that Ms. Tummillo had any expertise as to the Plaintiff's limitations with regard to anything other than Hepatitis C. Accordingly, the Court finds that the ALJ's determination that Ms. Tummillo's opinions be given little weight was well supported.

### 5. Dr. Waldman

■ With respect to the opinions of Dr. Waldman, the Plaintiff asserts that the ALJ erred by giving great weight to Dr. Waldman's opinion. The Court disagrees and affirms the decision of the ALJ with respect to the weight given to Dr. Waldman's opinions.

The Plaintiff relies on SSR 96–6p in claiming error with regard to the weight given Dr. Waldman's opinions. The Plaintiff argues that a treating source physician's opinions should be given greater weight than a State agency medical consultant, such as Dr. Waldman, with a single exception. The single exception arises when the State agency consultant's review of the record included reports from specialists on the individual's particular impairment, and the reports provided more detailed and comprehensive information than was available to the individual's treating source.

The Plaintiff's example is an accurate description of the example given in SSR 96–6p. *See* SSR 96–6p, 1996 WL 374180 at \*3. But, there is no indication from the ruling that the specific example given was the *only* scenario in which a State agency consultant's opinion could be given greater weight than a treating source; this was merely one example. *See id.*

The Plaintiff further argues that the ALJ should have given less weight to the opinion of Dr. Waldman because his opinion was not based on the complete medical record. SSR 96–6p only mandates the ALJ to get an updated medical expert opinion in the following circumstances:

> When no additional medical evidence is received, but in the opinion of the administrative law judge or the Appeals Council the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable; or

> When additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments.

*Id.* at \*4. As neither of the two situations listed above applies in this case, the ALJ was not mandated by SSR 96–6p to obtain an updated medical expert opinion. The ALJ's determination as to the weight given to Dr. Waldman's opinions is therefore upheld.

## B. Step Two Determinations of Severe Impairments.

■ The Plaintiff asserts that the ALJ failed to apply the proper legal standard of "slight abnormality" to the step two determination of whether the Plaintiff's impairments were "severe." Specifically, Plaintiff asserts that the ALJ failed to discuss the impairments of low back pain, hand pain, cirrhosis and sleep apnea. The Court finds that, although it is unclear whether the ALJ applied the correct legal standard at step two, any error is harmless and the decision of the Commissioner is affirmed.

A step two determination requires the ALJ to determine the severity of a claimant's impairments. 20 C.F.R. §§ 404.1520(a)(4)(ii), (c). A claimant carries the burden of establishing that she is disabled and must provide the medical and other evidence necessary to make determinations as to disability. 20 C.F.R. § 404.1512(a). An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. SSR 96-3p, 1996 WL 374181 at *1. Impairments that are "not severe" must only be a slight abnormality that has a minimal effect on an individual's ability to perform basic work activities. Id.; SSR 85-28, 1985 WL 56856 at *3.

At step two, if the ALJ finds an impairment is severe, "the question whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence." Pompa v. Comm'r of Social Security, 73 Fed.Appx. 801, 803 (6th Cir.2003). While the Second Circuit has not directly stated that incorrectly applying the step two legal standard is harmless error, when some of a claimant's impairments are determined to be severe and others not, other circuits have so stated. See, e.g., Carpenter v. Astrue, 537 F.3d 1264, 1266 (10th Cir.2008) ("Nevertheless,

any error here became harmless when the ALJ reached the proper conclusion that [plaintiff] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence."). A harmless error approach is consistent with the Second Circuits finding that step two severity determinations are to be used only to screen out de minimis claims. See Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir.1995).

Here, the ALJ did find that the Plaintiff had the following severe impairments: coronary artery disease, hypertensive heart disease, depression, obesity, renal artery stenosis, arthritis, chronic hepatitis, and a partial bursal tear in the left shoulder. (Tr. at 13). There is no claimed error as to finding these found impairments severe. The ALJ did not discuss the other impairments, with respect to which error is claimed, at all. Therefore, it is impossible for the Court to know what legal standard was applied, or whether the ALJ considered these impairments at all.

Nonetheless, because the ALJ did find several severe impairments and proceeded in the sequential process, all impairments, whether severe or not, were considered as part of the remaining steps. This result fits within the Second Circuit's description of step two as a screen for claimants with less than de minimis impairments. Accordingly, the ALJ's failure to make determinations on whether each and every one of Plaintiff's claimed impairments was severe is harmless error, and would not support a reversal of the Commissioner's decision.

## C. Credibility

As to credibility, the Plaintiff argues that the ALJ failed to make a sufficient credibility determination, as required under SSR 96-7p. The Court disagrees and

finds the ALJ's credibility determination is supported by substantial evidence.

In making disability determinations, the ALJ is required to consider a claimant's symptoms, including pain, and the extent to which the symptoms are consistent with objective medical evidence. 20 C.F.R. § 404.1529(a); SSR 96–7p, 1996 WL 374186.

> When the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms has been established, the intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities. This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects.

SSR 96–7p, 1996 WL 374186 at *1.

"A finding that the witness is not credible must ... be set forth with sufficient specificity to permit intelligible plenary review of the record." *Carroll v. Secretary of Health and Human Servs.*, 705 F.2d 638, 643 (2d Cir.1983). A credibility determination must cite to specific evidence in the case record and be sufficiently specific so that subsequent reviewers can determine the weight given to an individual's statements, and the reasons for that weight. SSR 96–7p, 1996 WL 374186 at *2.

■ Plaintiff claims that the ALJ made a conclusory statement on the credibility of the Plaintiff and failed to properly support it. The ALJ noted that "claimant's statements concerning ... these symptoms are not credible to the extent they are inconsistent with the ... residual functional capacity assessment." (Tr. at 16). But, the Plaintiff's reading of this as an unsupported conclusory statement fails to account for the two pages of the ALJ's opinion following the statement. The ALJ proceeded to describe precisely why the Plaintiff's credibility was undermined by citations to specific evidence in the record.

The ALJ first discussed the Plaintiff's complaints of knee, back, and left shoulder pain. The ALJ refers to specific exhibits in the record that support the Plaintiff's complaints, but goes on to find other objective medical evidence which supports the limitations of the residual functional capacity assessment. (Tr. at 16).

As to the Plaintiff's heart conditions, the ALJ refers to specific medical evidence and the opinion of Dr. Gaeta in concluding that any limitations are consistent with the residual functional capacity assessed. (Tr. at 16–17).

In regards to the Plaintiff's description of her mental condition, the Plaintiff finds the objective medical evidence supports the finding of impairment. (Tr. at 17). The ALJ cites to specific activities described in the record, such as a bus trip to Maine and a long weekend of cooking for family, to support ALJ's conclusion that the Plaintiff's mental condition is properly accounted for in the residual functional capacity assessment. (Tr. at 17). The ALJ also accounts for the Plaintiff's description of her daily life activities. (Tr. at 17).

The ALJ cited the record with sufficient specificity for the Court to find the ALJ's credibility determination on the Plaintiff's testimony was properly supported.

The ALJ also made a credibility determination with respect to the testimony of the witness Ms. Johnny Grice. The ALJ observed that Ms. Grice's testimony was duplicative of the Plaintiff's and provided no information that had not already been

considered by the ALJ. This satisfies the Court that the credibility determination of Ms. Grice was also properly supported.

## D. Residual Functional Capacity Determination

 The Plaintiff next claims that the RFC determination was not performed in compliance with SSR 96–8p. The Court here finds that there is no evidence or indication that the ALJ did not properly apply SSR 96–8p, and therefore affirms the decision of the Commissioner.

An RFC assessment is an individual's ability to do sustained work activities, and considers the functional limitations supported by medically determinable impairments. SSR 96–8p, 1996 WL 374184 at *1. This determination represents the most an individual can do despite her limitations, and requires an adjudicator to consider all relevant evidence in the case record, including both severe and non-severe impairments. *Id.* at *1, 5.

The Plaintiff claims that the ALJ failed to consider her non-severe impairments in making an RFC assessment. However, the Plaintiff never identifies which non-severe impairments were not considered. The Court cannot therefore say, as a matter of law, that the ALJ misapplied SSR 96–8p. The Court also notes that the Plaintiff's non-severe impairments were in fact considered in the RFC.

The ALJ found the Plaintiff to have an RFC to perform light work, with the following limitations:

> she can only occasionally bend, climb stairs, balance, stoop, kneel, crouch, and crawl; she cannot climb ladders, or frequently reach above shoulder level with

the left arm; she cannot be exposed to moving machinery, unprotected heights, or extreme cold or heat; and she is limited to tasks involving short, simple instructions in an environment with few workplace changes and no public contact.

(Tr. at 14).

The ALJ then went on to support this RFC assessment by discussing both the objective medical evidence and the medical opinion evidence in the record. (Tr. at 14–18). The Plaintiff previously claimed that back pain and hand pain were not properly considered as "severe" impairments at step two. The Court notes that the ALJ's opinion made specific mention of the Plaintiff's back pain and hand pain, including citing to objective medical evidence related to these impairments. (Tr. at 16).

The Plaintiff also claimed that cirrhosis and sleep apnea were not properly considered as "severe" at step two. The Court notes that the ALJ made mention of the Plaintiff's liver disease,[11] and found the RFC properly accommodated any limitations from that liver disease. (Tr. at 17).

The ALJ never specifically mentions sleep apnea in discussing the RFC determination. But, the Plaintiff never provided any evidence that the sleep apnea caused any limitation that would have affected her RFC determination. The sleep study performed on the Plaintiff specifically says that, while the Plaintiff does have obstructive sleep apnea, it is well controlled with the use of a CPAP machine. (Tr. at 447). Without any evidence of limitations from the sleep apnea, there was no reason for the ALJ to even mention it in the RFC.

---

**11.** Under the listing of impairments in 20 CFR, Part 404, Subpart P, Appendix 1, chronic liver disease "is characterized by liver cell necrosis, inflammation, or scarring (fibrosis or cirrhosis)...." *Id.* at 5.00(D)(1). Therefore, cirrhosis is not an impairment that is independently considered from liver disease.

Because the ALJ considered all the objective medical evidence and medical opinion evidence in the record in making an RFC determination, there was no error of law. In addition, for the reasons previously discussed, the RFC was supported by substantial evidence, a basis for affirming the decision of the Commissioner.

### E. Medical Expert Testimony.

■ The Plaintiff next asserts that the ALJ committed error in failing call a medical expert (ME) to testify regarding Plaintiff's combined impairments and GAF score of 48, as required under SSR 96–6p. The Court finds this was not error.

Under SSR 96–6p there are two situations where an ALJ "must obtain an updated medical opinion from a medical expert." SSR 96–6p, 1996 WL 374180 at *3 (footnote omitted). The first is when there is no additional medical evidence but "in the *opinion* of the [ALJ] ... symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable." *Id.* at *4 (emphasis supplied). The second situation is when there is additional medical evidence that "in the *opinion* of the [ALJ] ... may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments." *Id.* (emphasis supplied). Although the ALJ considers medical opinions on whether a claimant's impairments meet or equal any impairment(s) in the Listing of Impairments, the final responsibility for deciding these issues is reserved to the Commissioner. See 20 C.F.R. § 404.1527(e)(2).

There was no reason for the ALJ to call an ME for an updated medical opinion, concerning the GAF score of 48. As has been previously discussed, the GAF score was incorporated into Dr. Volpe's Psychi-atric Evaluation Forms. The GAF score was not new or additional medical evidence that would have altered Dr. Volpe's opinions and there was no reason to request an updated medical opinion from an ME on this topic, under the SSR 96–6p guidelines.

Requesting an updated medical opinion addressing Plaintiff's combined impairments was within the ALJ's discretion. The ALJ is only mandated to request an updated medical opinion from an ME when, "in the *opinion*" of the ALJ, such updated opinion is necessary. SSR 96–6p. The Court sees no reason why the ALJ's finding that the Plaintiff's combination of impairments failed to meet a listed impairment would require an updated medical opinion. While the ALJ does consider medical opinions in making a determination that a claimant's impairment or combination of impairments meets or equals a listed impairment, the final decision is reserved for the Commissioner.

### F. Vocational Expert Testimony.

The Plaintiff asserts a number of errors both surrounding the VE's testimony.

#### 1. The Hypothetical Claimant

■ The first claimed error is that the hypothetical claimant posed by the ALJ failed to account for all the Plaintiff's found impairments. The Court finds that the characteristics of the ALJ's hypothetical claimant were supported by substantial evidence.

The Plaintiff claims that the hypothetical claimant did not account for a number of the Plaintiff's restrictions, including moderate restrictions in social functioning; mild restrictions in daily living; and moderate restrictions in regards to concentration, persistence or pace. Further, the Plaintiff claims that the hypothetical failed to account for the Plaintiff's distractions from job activities, no more than 10 per-

cent of the time, in the following areas: maintaining concentration for extended periods of time, performing activities within a schedule, and working in coordination or proximity to others without being distracted by them.

The Plaintiff's argument, here, rests on Dr. Volpe's opinions in the Medical Source Assessment. (Tr. at 773–77). There, Dr. Volpe opined that the Plaintiff had no limitations that would be noticeable more than 10 percent of a workday. (Tr. at 773–77). Further, Dr. Volpe found a number of areas in which the Plaintiff had no limitations at all. For example, Dr. Volpe opined the Plaintiff could do the following without limitations: remember locations and work-like procedures; understand and remember very short, simple instructions; carry out very short simple instructions; maintain regular attendance; and be punctual within customary tolerance. (Tr. at 773–77).

The ALJ posed the following hypothetical claimant to the VE:

> ... [A]ssume this individual has the exertional capacity for light work. The individual can occasionally bend, climb stairs, balance, stoop, kneel, crouch, and crawl. Should not climb ropes, ladders, or scaffolds, or be exposed to hazards like moving machinery or unprotected heights. The individual should not reach above her shoulder with the left arm. In addition, this individual ... should have only short, simple instructions. Should work in an environment with few workplace changes and no contact with the public.

(Tr. at 54).

There is nothing logically inconsistent between the ALJ's posed hypothetical and the limitations alleged to have been improperly excluded. The ALJ's hypothetical claimant was limited to short simple instructions in an environment with few workplace changes and no regular public contact. The hypothetical claimant's limitations seem adequate to accommodate any of the Plaintiff's limitations in this regard, especially considering that the maximum severity of the Plaintiff's limitations is only up to 10 percent of a workday.

## 2. Reliability of the Vocational Expert Testimony.

The Plaintiff next asserts that the VE's testimony was not reliable and lacked adequate foundation to support the claimed number of jobs existing in the national economy. The Second Circuit has not addressed what, if any, requirements are imposed on an ALJ to probe the reliability and foundation of VE testimony.

In the absence of Second Circuit precedent, the Court has looked at the decisions of other courts on this issue. The Ninth Circuit has found that "[a] VE's recognized expertise provides the necessary foundation for his or her testimony." *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005). But the Seventh Circuit, while recognizing the Federal Rules of Evidence do not apply at an administrative hearing, requires an ALJ to inquire into the reliability of a VE's opinions when they are challenged. *See McKinnie v. Barnhart*, 368 F.3d 907, 910–11 (7th Cir.2003) ("If the basis of the [VE's] conclusions is questioned at the hearing ... then the ALJ should make an inquiry ... to find out whether the purported expert's conclusions are reliable.") (citation omitted).

District courts within the Second Circuit have tended to align more closely with the Seventh Circuit approach. *See, e.g., Ali v. Astrue*, 2010 WL 502779 at *5 (W.D.N.Y. Feb. 9, 2010) ("While the rules of evidence are not applicable in administrative proceedings, the ALJ needs some evidentiary basis to rely upon the opinions of the vocational expert.") (remand); *Freegard v.*

*Astrue*, 2011 WL 4915744 at *10 (D.Vt. Sep. 20, 2011) (quoting *Ali*, 2010 WL 502779 at *5) (remand); *Palmer v. Astrue*, 2011 WL 3881024 at *6 (D.Vt. Sep. 2, 2011) (affirming ALJ's decision where VE's testimony was based on identifiable statistics).

In this case, Plaintiff's counsel questioned the VE's testimony during the ALJ hearing. The VE testified that she relied on her personal experience, labor market surveys, and published statistical sources in determining the number of jobs available in the economy. (Tr. at 56). The ALJ also allowed the Plaintiff to submit certain additional interrogatories to the VE. (Tr. 315–17). In the responses to the interrogatories, the VE again affirmed that she relied on her personal experience, but also provided citations to the sources from which she obtained the employment statistics, as well as the methodology used in acquiring the statistics. (Tr. at 315–17).

The VE used aggregate statistical data from the multiple data sources, namely the U.S. Bureau of Labor Statistics (BLS) and the Connecticut Department of Labor. (Tr. at 315). The statistical occupational data in the Occupational Employment Survey (OES), from the BLS, is classified using the Standard Occupational Classifications (SOC).[12] Once this data was compiled for a given SOC, the VE then reduced the number of jobs in the SOC by 25 to 50 percent based on the number of *DOT* codes that fit within that SOC.[13] (Tr. at 316)

The VE utilized reliable statistical sources as well personal knowledge and experience to develop the occupational projections provided. While the VE did not provide a step-by-step description of the methodology used, this Court cannot say that the ALJ erred in accepting the VE's testimony as reliable, as there was a sufficient basis for the ALJ to so find.

### 3. Subpoena Request

Plaintiff next claims that the ALJ committed error in failing to provide a written notification for the denial of her subpoena duces tecum request. While the ALJ did not provide written notice for the denial of the subpoena, the Court finds the subpoena request was adequately addressed on the record at the hearing.

The Plaintiff relies on the SSA's Hearings, Appeals, and Litigation, Law Manual (HALLEX) for the proposition that the ALJ is required to provide written notification for a denial of a subpoena. HALLEX I–2–5–78(D) requires that "[i]f an ALJ denies a … request for a subpoena, the ALJ must provide … written notification of the denial of the request, … enter both the request and the denial notification into the record," and "include rationale that explains why" the request was denied.[14]

Even if the ALJ did violate this HALLEX provision, internal agency documents, such as HALLEX, do not to carry the force of law and are not binding on the SSA. *Parra v. Astrue*, 481 F.3d 742,

---

**12.** The BLS website provides a comprehensive overview of the OES program, available at http://www.bls.gov/oes/. The BLS recognizes that one specific use of the OES data is for "development of occupational projections." *Id.*

**13.** The VE's 25 to 50 percent reduction methodology is not fully explained by the VE in the responses to interrogatories. (Tr. at 316). As

long as this methodology is not wholly arbitrary and provides a fair estimate of the jobs available in the national economy then it may be relied upon.

**14.** HALLEX I–2–5–78(D), available at http://www.ssa.gov/OP_Home/hallex/I–02/I–2–5–78.html.

750 (9th Cir.2007) (collecting cases). "Therefore, they do not create judicially enforceable duties, and we will not review allegations of noncompliance with their provisions." *Id.*

Here the Plaintiff was seeking, by way of subpoena, all documents relied upon by the VE in formulating testimony on the number of jobs. (Tr. at 161–62). While the ALJ did not expressly provide written notification of the denial of the subpoena request, the merits of the subpoena request were addressed at the hearing. There, the ALJ denied the Plaintiff's request for the surveys performed by the VE, (Tr. at 56), and documents the VE brought to the hearing, (Tr. at 57).

Because these requests, made at the hearing, were substantially the same as the request made in the subpoena duces tecum, pre-hearing, Plaintiff was not prejudiced by the ALJ's failure to make a written notification. The ALJ's decision to deny the subpoena requests was supported by substantial evidence here, because the documents requested were unnecessary to the ALJ's ultimate finding the VE's testimony reliable, as discussed previously.

### 4. VE's Application of the Hypothetical Limitations

██ Plaintiff next claims the VE improperly applied the hypothetical limitations in determining the DOT codes relied upon in the VE's testimony. The Court finds that the VE's application of the hypothetical limitations was not improper and provided substantial evidence for the ALJ's conclusions.

The VE identified three jobs capable of being performed by the Plaintiff. The jobs identified were marker, DOT title 209.587–034; routing clerk, DOT title 222.687–022; and mail clerk, DOT title 209.687–026. The Plaintiff claims that because all three jobs require frequent reaching, they were inconsistent with the hypothetical as the Plaintiff is limited to not reaching above shoulder level with the left arm.

There is no evidence that Plaintiff would not be able to perform any reaching tasks required without exceeding the limitation on her left arm. The Court may not substitute its own judgment for that of the ALJ in assessing the VE's identification of the three jobs as consistent with the hypothetical.

The Plaintiff also claims that General Educational Development (GED) [15] reasoning levels of the three jobs exceed the hypothetical limitation of "short, simple instructions." A number of courts have found that a limitation of simple tasks or instructions is consistent with GED level 2 reasoning. *See Carrigan v. Astrue*, 2011 WL 4372651 at *10–11 (D.Vt. Aug. 26, 2011) (collecting cases from the 3d, 9th, and 10th circuit courts of appeal). At least two circuits have also found that GED level 3 reasoning is not inconsistent with the ability to perform only simple tasks. *See Renfrow v. Astrue*, 496 F.3d 918, 921 (8th Cir.2007) (finding that two unskilled GED level 3 reasoning jobs were not "complex" and not inconsistent with claimant's limitations); *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir.2009) (holding that GED level 3 reasoning was not inconsistent with ability to perform only "simple" work).

---

15. A GED reasoning level 2 requires an individual to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions." Appendix C, *Dictionary of Occupational Titles* (4th Ed., Rev. 1991) *available at* http://www.oalj.dol. gov/PUBLIC/DOT/REFERENCES/DOTAPPC. HTM. A GED reasoning level 3 requires individuals to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form." *Id.*

With respect to the jobs identified by the VE, routing clerk and marker have GED level 2 reasoning, and mail clerk has GED level 3 reasoning. There is nothing in the record to suggest that the Plaintiff cannot satisfy the requirements of either GED level 2 or 3 reasoning. The hypothetical limitation of only short, simple instructions is, therefore, not inconsistent with either jobs requiring GED level 2 or 3 reasoning.

### 5. Cross-examination of the VE

The Plaintiff's final claimed error was that the ALJ improperly denied cross-examination of the VE with respect to the SSA Grid. The ALJ denied cross-examination on the grounds that the VE was neither expected nor asked to testify or have familiarity with the SSA grid rules. The Grid is a tool used by the Commissioner in making a determination of disability. Application of the Grid, and conclusions of whether a claimant is disabled, within the meaning of the Social Security Act, is not within the realm of expertise of a VE. Accordingly, the ALJ's ruling was not error.

### CONCLUSION

Plaintiff's Motion for Judgment [**Doc. # 15**] is **DENIED**, and Defendant's Motion for Order Affirming the Decision of the Commissioner [**Doc. # 29**] is **GRANTED**.

Any objections to this recommended ruling must be filed with the Clerk of the Court within fourteen (14) days of the receipt of this order. Failure to object within fourteen (14) days may preclude appellate review. *See* 28 U.S.C. § 636(b)(1); Rules 72, 6(a) and 6(e) of the Federal Rules of Civil Procedure; Rule 2 of the Local Rules for United States Magistrates; *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir.1989) (per curiam); *FDIC v. Hillcrest Assoc.*, 66 F.3d 566, 569 (2d Cir.1995).